**Vincent BOWLER, Petitioner,**

**v.**

**U.S. IMMIGRATION AND NATURAL-IZATION SERVICE, Respondent.**

**No. 94 M–54.**

United States District Court,
S.D. New York.

Sept. 12, 1995.

Mary Jo White, United States Attorney, Southern District of New York, New York City, F. James Loprest, Jr., Special Assistant United States Attorney, of counsel, for respondent.

Paul Freedman, New York City, for petitioner.

### Memorandum Opinion and Order

SOTOMAYOR, District Judge.

At the invitation of the Court, respondent, the United States Attorney's Office for the Southern District of New York, has moved for sanctions against petitioner Vincent Bowler's attorney, Paul I. Freedman ("Freedman"), pursuant to Federal Rule of Civil Procedure 11 ("Rule 11"). Freedman, in turn, moves for Rule 11 sanctions based on respondent's filing of the instant motion. For the reasons discussed below, petitioner's and respondent's Rule 11 motions are denied. I do, however, impose sanctions against Freedman pursuant to 28 U.S.C. § 1927 ("§ 1927").

## Background

Vincent Bowler ("Bowler"), a citizen and national of Jamaica, entered the United States on a six month tourist visa in November 1983. Since that time, Bowler has compiled an extensive criminal record, including possession of marijuana and a loaded firearm. *See* Record File—Deportation Proceedings, certified September 9, 1994 (hereinafter "Deportation Record"), at 88–90, attached as Ex. 5 to Declaration of F. James Loprest, Jr., sworn to November 30, 1994 (hereinafter "Loprest Decl."). On March 18, 1993, the United States Immigration and Naturalization Service ("INS") served an administrative order to show cause on Bowler, who was serving a sentence on a New York State weapons charge at the Collins Correctional Facility in Helmuth, New York, why he should not be deported. *Id.* In the order to show cause, the INS alleged that Bowler was deportable because he had overstayed his visa and due to his criminal record pursuant to 8 U.S.C. § 1251, subsections (a)(2)(B)(i) and (a)(2)(C). *Id.*

In late 1993 or early 1994, Bowler was taken into federal custody and transferred to the Federal Correctional Institutional at Oakdale, Louisiana ("Oakdale"). On April 7, 1994, Bowler was notified that his deportation hearing would be held at Oakdale on May 10, 1994. At the May 10 hearing, Immigration Judge Charles A. Wiegand, III (the "Immigration Judge") advised Bowler about the nature of the proceeding, advised him of his right to counsel, and gave him a list of *pro bono* counsel in the area. Bowler requested an adjournment of the proceedings so that he could try to retain a private attorney. *See* Hearing Transcripts, attached as Ex. 6 to Loprest Decl. (hereinafter "Hearing Trans."), at 2–3. The Immigration Judge granted Bowler's request, and set a new hearing date for May 20, 1994. Bowler was handed a notice that contained the new hearing date. *Id.*

At the May 20 hearing, Bowler informed the Immigration Judge that he was still making arrangements to retain an attorney, and that he was trying to obtain a bond so that he could be released from detention. *Id.* at 4. The Immigration Judge delayed the proceedings until June 14, 1994. *Id.* at 5. The Immigration Judge advised Bowler that if he was released on bond before the June 14 hearing, Bowler would still be obliged to be present for that hearing "unless you [Bowler] receive notice from my office that the [June 14] hearing has either been postponed or that the venue of the proceeding is changed to some other location." *Id.* at 5.

On May 23, 1994, the INS granted Bowler's request for release on a $15,000 bond. *See* Loprest Decl. at ¶ 7. Thereafter, Bowler apparently left Louisiana for New York. Bowler did not appear at the June 14 hearing. At that hearing, the Immigration Judge noted that Bowler had not contacted the Court to explain his absence, and conducted a hearing *in absentia* pursuant to 8 U.S.C. § 1252b, which empowers immigration judges to deport aliens who fail to show exceptional circumstances for failing to appear at a scheduled hearing. *See* Hearing Trans. at 5. The government produced evidence concerning Bowler's alienage, entry into the United States, and criminal history. *Id.* at 6. Finding the government's evidence sufficient to support a deportation order, and in light of Bowler's failure to either appear or to apply for any form of relief, the Court ordered Bowler deported to Jamaica pursuant to 8 U.S.C. § 1252b(c)(1).

On June 21, 1994, Bowler, through his recently retained counsel Freedman, filed a motion to reopen his deportation proceedings with the INS's District Office in New York. *See* Deportation Record at 38. In the motion, Freedman affirmed under penalty of perjury that he meant to file a motion to change the venue of Bowler's deportation hearing prior to the final hearing held on June 14, but failed to do so because his office was "backed up" with other cases and a new employee made a mistake. *Id.* at 39 and 41. Freedman indicated that he wished to file an application for political asylum, although he did not specify the grounds for such an application. *Id.* at 40. Attached to the motion to reopen was an affidavit executed by Bowler, in which he states that he retained Freedman on June 6, 1994 and that he did not show up to the June 14 hearing because Freedman told him that the hearing would

be rescheduled. *Id.* at 42. The INS opposed the motion to reopen, and forwarded it to the Immigration Judge in Oakdale.

On June 27, 1994, Bowler's deportation order became final, because he had failed to file a notice of appeal to the Board of Immigration Appeals. *See* Loprest Decl. at ¶ 9; 8 C.F.R. §§ 3.38–3.39 (alien has 13 days to file notice of appeal from Immigration Judge's decision when notice of decision provided by mail, after which time decision of Immigration Judge becomes final). On July 14, the Immigration Judge in Oakdale denied Bowler's motion to reopen the deportation proceedings because Bowler had failed to show any exceptional circumstances for failing to appear as defined by 8 U.S.C. § 1252b(f)(2). *See id.* at 30–31.

On the basis of the June 14 order of deportation, the INS ordered Bowler to surrender for deportation at Oakdale on July 15, 1994. When Bowler did not surrender, the brokerage firm that posted Bowler's $15,000 bond hired Fugitive Task Force, Inc. ("FTF") to locate Bowler. *See* Affidavit of John Mancini, sworn to September 9, 1994 ("Mancini Aff."), at ¶ 1.

On August 12, Freedman filed another motion to reopen the deportation proceedings with the INS District Office in New York. Again, Freedman indicated that he wished to file an application for political asylum, but did not specify the grounds for such an application. *See* Deportation Record at 20. The INS forwarded this motion and its opposition papers to the Immigration Judge in Oakdale.

On August 19, 1994, Freedman filed an Order to Show Cause in this Court (the "August 19 Order to Show Cause") seeking to stay the deportation and the activities of FTF. Sitting in Part I, this Court's emergency part, Judge Loretta A. Preska denied the order to show cause without prejudice, *inter alia*, because Freedman had failed to include a memorandum of law setting forth the jurisdictional basis for the action. *See* Order to Show Cause, dated August 19, 1994.

On Tuesday August 23, 1994, John Mancini ("Mancini"), a FTF bail enforcement agent, was informed by the Bronx County Probation Office that Bowler was present in that office. Mancini Aff. at ¶ 3. Mancini went to the Probation Office sometime between 4:00 and 4:30 pm on August 23, and took custody of Bowler. *Id.* at 4; *see also* Affidavit of Michael Siegel, sworn to September 9, 1994 ("Siegel Aff."), at ¶ 4. Mancini made arrangements to transport Bowler to the Oakdale and then brought Bowler to a hotel in Clifton, New Jersey. At 2:00 am on August 24, Mancini and Bowler were joined at the hotel by FTF bail enforcement agent Michael Siegel ("Siegel"). Siegel Decl. at ¶ 4. At about 6:20 am on August 24, Siegel, Mancini, and Bowler boarded a flight to Dallas, Texas. *Id.* at ¶ 5. From Dallas, the trio caught a flight to Alexandria, Louisiana, and then drove to Oakdale where INS officers took custody of Bowler at about 1:00 pm. Mancini Aff. at ¶ 7. From the moment of his apprehension in the Bronx to his arrival in Oakdale, Bowler was in the constant custody of Mancini and Siegel. Siegel Aff. at ¶ 7.

On August 24, Freedman refiled the Order to Show Cause in this Court (the "August 24 Order to Show Cause"). At that time, I was the Part I judge. Attached to both the August 19 and the August 24 Orders to Show Cause were letters from FTF to Freedman. In one of the letters, dated August 16, 1994, Siegel stated:

> I have been waiting for you to return my phone calls. It appears that you are not going to follow thru [sic] with your promises. We have been trying to work this out with your office since the end of last week, but when promises are not kept . . . then we will have to execute the actions that are within our legal rights . . . Please be advised that unless this matter is resolved today, Mr. Bowler will be apprehended and transported back to Oakdale La.

*See* Letter of Michael Siegel, attached to August 19 Order to Show Cause at Ex. A; August 24 Order to Show Cause at 9 (hereinafter the "Siegel Letter").[1]

---

1. In paragraph 6 of his declaration, Siegel affirms that on or about August 4, he informed Freedman that Bowler would be transported

from the Bronx to Oakdale. This date is clearly erroneous, as Siegel and Mancini did not gain custody of Bowler until August 23. Given that

In the accompanying Memorandum of Law, Freedman represented that this Court had jurisdiction because "the relief sought is not a review of a final order" as Bowler simply sought review of a denial of a stay of deportation while his motion to reopen was still pending. *See* Memorandum of Law, attached to Loprest Decl. at Ex. 1. At a hearing held the same day the Order to Show Cause was filed, August 24, Freedman stated that Bowler's deportation hearing was supposed to have been conducted telephonically. Freedman continued:

> [i]n this situation, the [immigration] judge apparently contacted our office. A member of our firm contacted the judge, because Mr. Bowler was in our office. Let me state for the record, Mr. Bowler's affidavit I believe was under the original order to show cause. He was in our office. He appeared in our office.

> We attempted to contact the judge. The judge has one phone in Louisiana, not nine lines, one phone. The judge was on trying to reach either us or doing another hearing. We don't know. We attempted to call the judge four times in an attempt to request a continuance because our office was engaged in [another matter] ...

> We couldn't get through to the court. The judge in that situation tried us. We tried the judge ...

> The petitioner in this proceeding did not fail to appear at our office. That's where the hearing was taking place. The judge issued him an order of deportation in absentia. Our office did not file an appeal within the 10–day required filing period because of the fact that the filing of the appeal would have brought this case to the Board of Immigration Appeals in Virginia. It would have wasted months of time. Instead, we filed a motion to reopen.

*See* August 24, 1994 Hearing Transcript at 5–6, attached as Ex. 2 to Loprest Decl. Addressing whether jurisdiction was proper in this Court, Freedman maintained:

> we submitted a memorandum of law which shows this is a nonfinal order ... The reason why [Y]our Honor has jurisdiction is on three simple bases. One, he [Bowler] was detained in New York when he went to his probation officer. His probation officer acted as an agent of the Immigration and Naturalization Service and held him, due to the fact that he did not have an order staying deportation yesterday ... the probation officer then contacted the Fugitive Task Force and they came from New Jersey to take him. When the order to show cause was filed, he [Bowler] was still in New York. We don't know where he is now.

> Your court has jurisdiction because he had no violation of probation. He was held on an immigration violation, failing to appear in Louisiana. INS has a district director who sends their agents from 26 Federal Plaza. No one from Louisiana is here. If there was an agent from Louisiana, [Y]our Honor, the government might be able to argue this is a Louisiana jurisdiction case.

*Id.* at 7, 9–10. Relying on Freedman's representations, I

> accept[ed] Mr. Freedman's argument that to the extent that he has surrendered himself here in New York to probation officers ... that his body was taken here, that I have his body.

*Id.* at 15. I then enjoined the government from executing Bowler's order of deportation and scheduled another hearing for August 30, 1994. *Id.* at 16–17. Specifically, I instructed the parties that I would

> stay his [Bowler's] deportation only so long as until the 30th to give me time to look at this, and I want more papers from you in the interim.

> Secondly, Mr. Freedman, give me something in writing that makes sense. I am only staying this until the 30th and/or until a decision is rendered on the motion for reopening [before the Immigration Judge]. If it's denied in this interim, you have a

the paragraphs in Siegel's declaration are in chronological order, and that paragraph 5 details the events of August 23, I believe that August 4 is a typographical error that should read August 24. Regardless, Freedman's inclusion of the August

16 letter in the August 19 Order to Show Cause clearly demonstrates that Freedman was on notice that Bowler would be transported to Louisiana immediately upon his apprehension.

final order and you may go to the Court of Appeals. I am assuming that I have jurisdiction only so long as that has not been entered. I am not giving you an indefinite stay.

*Id.* at 14.

On August 26, 1994 at 10:24 a.m., the following message was left on FTF's answering machine:

My name is Irwin Berowitz. I'm calling from the law office of Paul Freedman, we're attorneys for Vincent Bowler. Two days ago a Federal District Court Judge ordered that Vincent Bowler not be removed from the greater New York Metropolitan area and that his deportation be stayed pending a full hearing before her, Judge Sonia Sotomayor, in Foley Square. We now understand that Vincent Bowler has been removed from New Jersey. I suggest that you call Judge Sotomayor's chambers as quickly as possible before she cites you for being in contempt of her order. Her telephone number is 791– [the message cut off at that point].

*See* Mancini Decl. at ¶ 9.

Just prior to the August 30 hearing, the government submitted a letter to the court noting, *inter alia,* that petitioner had not started a valid proceeding before this Court by filing either a writ of habeas corpus or a complaint. The government also alleged, with legal citations, that if petitioner's August 24 application was intended to be a writ, the Court lacked jurisdiction because Bowler had been taken out of New York the night before the service of the order to show cause application. Finally, the government maintained that the court had no jurisdiction because petitioner had failed to exhaust his administrative remedies by failing to seek a deportation stay from the INS District Director in either Louisiana or New York.

At the August 30th hearing, I again expressed concern with the status of the motion to reopen before the INS District Director and whether I had jurisdiction over this matter.

That letter [the Government's August 30 letter], yes, is not what I want, Mr. Loprest. I want an actual statement.

Where did they [FTF] pick him [Bowler] up, when and where, and from whom, and under what circumstances. . . .

And I want to know whether that act had occurred and where this man was physically on what dates. Because even if the apprehension initially, Mr. Freeman, had been here, if the body had already been moved by the time I came in, and maybe you belonged in New Jersey or Louisiana, I am still trying to find out.

Transcript of August 30, 1994 Hearing at 6–7.

At the August 30th hearing, the government did not know whether the motion to reopen had been decided. Moreover, Freedman recognized that he had not properly commenced an action and explicitly promised this court that he was going to file a writ of habeas corpus:

Mr. Loprest: I think it was remiss last week not to ask that petitioner be required to properly file a civil action in this case and get a civil number.

The Court: I think yes.

Mr. Freedman: I said I would do that. I want to let the record note that I will do so.

*Id.* at 10. I continued to stay Bowler's deportation pending further briefing by the parties and a decision from the INS regarding Bowler's motion to reopen his deportation proceedings. *See* August 30, 1994 Hearing Transcript, at 7–10, attached as Ex. 7 to Loprest Decl. Relying on Freedman's representations, I found that Bowler had been unable to present his arguments to the Immigration Judge because Bowler had

in fact [been] present in the attorney's office for the hearing in question . . . and there was a snafu due to an inability to get through on the telephone lines but the gentlemen in fact was present and has been deemed to have waived or waived his presence when he in fact didn't. That is the issue that I have before me in affidavits.

*Id.* at 12–13.

At the August 30 hearing, both Freedman and his associate Irwin Berowitz ("Berowitz") were present. I informed them that my

Chambers had received an "hysterical call" from FTF representatives who stated that a member of Freedman's office said that I was going to hold FTF in contempt. Freedman responded:

Mr. Berowitz has spoken with me, who is the individual who spoke with the individual at the [Fugitive] Task Force ... No member of this firm ever communicated an 'order of Judge Sotomayor that if they didn't act in a certain way they would be held in contempt.' The individual who spoke with them is to my left and my investigation and my firm indicates that no one threatened contempt in your name ... They say they have a voice mail ... let them give you a transcript of the voice mail.

*Id.* at 13–14. After warning Freedman and Berowitz not to misrepresent orders of the Court, I set another hearing date for September 9, 1994. *Id.* at 10–11. Freedman was directed to file a petition of habeas corpus in order to provide the proper legal and procedural basis for Bowler's petition before me. *Id.* at 10.

By letter dated September 1, 1994, Freedman requested an adjournment for the filing of papers and of the hearing date because his son was ill. By Order dated September 9, 1994, I granted the adjournment and set new dates for papers and a hearing for September 27, 1994. On September 11, 1994, Freedman again asked for a further adjournment of the scheduled dates. That request was denied. On September 23, 1994, Freedman asked for another adjournment, without even a cursory response to the very serious allegations in the government's papers filed on September 15, 1994, that he had misrepresented facts to the Court and that no legal or factual basis existed for the court's continuing jurisdiction. Freedman's September 23 request for an adjournment was also denied.

After reviewing the government's September 15 affidavits and documents and the Government's subsequently submitted memorandum of law, it became apparent that Freedman had misled me. The government's papers unequivocally demonstrated that Freedman had never sought permission to hold a telephone conference in place of the June 14

deportation hearing as he had misled me into believing. From the government's papers, I also learned that the motion to reopen "was based on a totally unrelated issue of political asylum," for which Bowler had never submitted any supporting papers and that his appeal to the District Director to stay the deportation was based on the same flawed documents.

Finally and most significantly, the INS on September 7, 1994 had denied Bowler's motion to reopen and stay of deportation. Freedman had failed to notify me of this denial and had not mentioned it in any of his numerous requests for adjournments despite my repeated comments at the August 24 and August 30 hearing that I would keep my temporary stay in place only until that motion was decided.

At the September 27 hearing, I held that the September 7 denial of Bowler's second motion to reopen made Bowler's deportation order final, and deprived me of jurisdiction. *See* Hearing Transcript, dated September 27, 1994, at 5. I also determined that even if this were not the case, I never had jurisdiction to issue my temporary stay because Bowler was outside the jurisdiction of the court when the motion seeking a stay was filed and when the stay of deportation was issued. *Id.* I also concluded that I had issued the stay on misrepresented facts and lifted the stay. *Id.* at 6. I noted, for example, that Freedman represented that Bowler's deportation hearing was supposed to have been conducted by via telephone conference, and that Bowler went to Freedman's office to participate in the telephone conference. In fact, Freedman never arranged for a telephone conference to be conducted, nor had he ever secured an order from the Immigration Judge transferring venue to New York. *Id.* Finally, I invited the government to submit papers in support of Rule 11 sanctions based on Freedman's gross misrepresentations to the court. *Id.* at 7.

The government maintains that from the inception of the instant action, Freedman not only failed to make a reasonable inquiry as to the facts, but flagrantly misrepresented them to the Court. The government further ar-

gues that the instant action was filed improperly to delay Bowler's deportation.

Freedman argues that Rule 11 does not apply to any verbal representations he made to the Court during the various hearings before me. *See* Memorandum of Law by Petitioner's Counsel in Opposition to Motion for Sanctions and in Support of his Cross–Motion for Sanctions at 3. He further argues that sanctions cannot be imposed based upon his representations that Bowler was present in this judicial district when the August 24 order to show cause was drafted and filed because respondent's attorney, who as the representative of the government is necessarily better positioned, did not know of Bowler's exact location either. *Id.* at 2. Finally, Freedman argues that the government improperly delayed in bringing the instant motion. *Id.* at 2. In a "Rebuttal Affirmation," Freedman asks that I deny the motion for sanctions because he is undergoing "psychiatric and psychological treatment", and because he has resigned from the New York Bar. *See* Undated Rebuttal Affirmation of Paul I. Freedman at ¶¶ 1–2.

### *Discussion*

■ I do not apply Rule 11 sanctions to the instant case because of the failure to provide notice as required by Rule 11(c)(1)(A). Under Rule 11(c)(1)(B), a court may impose sanctions under Rule 11 on its own initiative only if an order is entered by the court directing an attorney or party to show cause why Rule 11 sanctions should not be imposed. Because I invited the government to consider whether to seek Rule 11 sanctions, no such order to show cause was issued. Under Rule 11(c)(1)(A), a party may move for sanctions, but the non-moving party must be given twenty-one days to withdraw or correct the challenged paper. Unfortunately, in cases involving orders to show cause and preliminary injunctions, such as this one, a twenty-one day waiting period is often impractical. In the instant case, I lifted the stay of deportation, thereby terminating petitioner's action, before the govern-

ment had the opportunity to discover and react to Freedman's misconduct under Rule 11. Although I agree with the government that Freedman's misconduct falls within the ambit of Rule 11 and I could conclude that the government's various letters questioning the legal and factual basis for Freedman's application gave Freedman "notice" of his misconduct, I choose not to impose sanctions under Rule 11 because of the ambiguity of whether its procedural requirements have been met here.

■ I also reject Freedman's cross-motion for Rule 11 sanctions. Respondent filed the instant motion at my invitation. Even without my invitation, I find that respondent would have had a good faith basis to bring a Rule 11 motion.[2]

■ In addition to Rule 11, however, a court may impose sanctions under 28 U.S.C. § 1927 ("§ 1927") and the inherent power doctrine. *See U.S. v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO,* 948 F.2d 1338, 1344 (2d Cir.1991); *see also Oliveri v. Thompson,* 803 F.2d 1265 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987).

■ Section 1927 provides that an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred because of such conduct." Thus, § 1927 "imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics." *Int'l Bhd. of Teamsters,* 948 F.2d at 1345. As the purpose of § 1927 is to deter unnecessary delays in litigation, an award under this statute is appropriate "when an attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Id.* (citing *Oliveri,* 803 F.2d at 1273 and H.R.Conf.Rep. No. 1234, 96th Cong., 2d

---

2. Although tempted, I will not issue an order directing Freedman to show cause why he should not be sanctioned under Rule 11 for bringing his cross-motion for sanctions. Although I believe Freedman's cross-motion is frivolous, it is my hope to bring some measure of finality to the instant action.

Sess. 8, U.S.Code Cong. & Admin.News 1980, p. 2716). Unlike Rule 11 sanctions which focus on particular papers, the inquiry under § 1927 is on a course of conduct. *Id.* at 1346. Bad faith "is the touchstone of an award under this statute." *Id.* at 1345 (citation omitted).

 The inherent power doctrine, also known as the bad faith exception to the American Rule against fee shifting, derives from a court's need to manage its affairs so as to achieve an orderly and expeditious resolution of cases. *Id.* at 1345 (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) (quoting *Link v. Wabash R.R. Co.,* 370 U.S. 626, 630–31, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962)). Under the "inherent power" doctrine, attorneys' fees can be imposed when the losing party has continued an action "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (citing *Alyeska Pipeline Serv. Co. v. Wilderness Society,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975)). The Supreme Court and the Second Circuit have long cautioned that the inherent power doctrine should be used with "restraint and discretion." *See Chambers,* 501 U.S. at 52, 111 S.Ct. at 2137. Thus, the Second Circuit requires (1) clear evidence that the challenged actions were entirely without color and taken for improper purposes such as harassment or delay; and (2) a high degree of specificity in the district court's factual findings before sanctions may be imposed under the inherent power doctrine. *See Int'l Bhd. of Teamsters,* 948 F.2d at 1345 (citations omitted).

 I find that sanctions under § 1927 are appropriate in the instant action.[3] In his papers, Freedman does not deny that he never arranged for a telephonic hearing with the INS. As I repeated at the September 27 hearing, the decisive factor in my decision to order a stay of deportation was my belief that the INS knew Bowler was in New York and that a 'snafu' or some technical error had deprived Bowler of his right to be heard. Freedman knew that this was a decisive factor in my decision to issue an injunction at the August 24 hearing. I specifically referenced his misrepresentation and my reliance upon it at the August 30 hearing. *See, supra,* at 602. Freedman's bad faith is further illustrated by Berowitz's phone call to FTF, threatening it with contempt.[4] At the August 30 hearing, Freedman admitted the call was made but denied that anyone "threatened contempt in your name ... They [FTF] say they have a voice mail ... let them give you a transcript of the voice mail." *See* August 30 Hearing Transcript at 13–14. The government accepted Freedman's suggestion, and set forth a transcription of FTF's answering machine tape in Mancini's declaration, which was prepared and executed within ten days of the August 30 hearing. *See* Mancini Decl. at ¶ 9. Freedman's papers fail to address, let alone challenge, the accuracy of the transcription. In fact, Freedman's papers are silent on this issue. Nothing in the record suggests any reason why I should not credit the facts as set forth in Siegel's and Mancini's declarations.

In short, Freedman filed a baseless application for a stay which he continued to advocate improperly even after any reasonable inquiry would have led a practitioner acting in good faith to conclude that he or she had no legal or factual basis for their position. Freedman has not offered an even plausible

---

3. Although the parties have not filed briefs on the propriety of sanctions under § 1927 or the inherent powers doctrine, I believe it appropriate to consider these sanctions. The explanations Freedman has proffered regarding his conduct apply with equal force to a motion for sanctions under § 1927. The inquiry here is a largely factual determination based upon the record created at the three hearings before me. If Freedman in good faith believes that he has any additional legal defenses to § 1927 sanctions, he may of course set them forth in a motion for reargument. *See* Southern District of New York Local Civil Rule 3(j).

4. Freedman is responsible for Berowitz's violation of the Disciplinary Rules of the Code of Professional Responsibility because Freedman was Berowitz's supervisor and knew or should have known about the content of the phone call. *See* Model Code of Professional Responsibility DR 1–104 (responsibilities of a supervisory lawyer), adopted by the Appellate Divisions of the Supreme Court of New York as DR § 1200.5. Furthermore, Freedman took no remedial steps in response to Berowitz's phone call to FTF. *Id.*

excuse for his conduct in continuing to advocate his application after it became clear that he had no basis for it. An attorney with Freedman's expertise in immigration law could only act in bad faith when he asks the court for repeated adjournments to file supplemental papers to his admittedly incomplete initial pleadings and then fails to do so. Collectively, the actions described above demonstrate the sort of bad faith and improper course of conduct required to impose sanctions under § 1927.[5]

Although I do not impose sanctions based upon the following issues, I note that Freedman made a series of half-truths regarding the basis for jurisdiction in the instant action. Freedman stated that Bowler was in New York when the Order to Show Cause was filed. *See* August 24 Hearing Transcript at 9–10. While this may have been true on August 19, it is dubious that Freedman believed that Bowler was in New York when the August 24 Order to Show Cause was filed. Freedman clearly knew that Bowler would be transported by FTF to Oakdale. *See* Siegel Letter. There is some evidence suggesting that Freedman received a phone call on August 24 from FTF informing him that Bowler was in Oakdale. Furthermore, Freedman's numerous representations that the focus of the instant action was to review a non-final order smack of bad faith, and at best reflect an extraordinary disregard of the law and the procedural posture of Bowler's case.

■ The government requests sanctions in the amount of $5,825.00. The government calculated this amount by determining the number of hours spent by various members of the United States Attorney's Office, and then charging the rate at which each individual would charge at a New York law firm of comparable size and expertise. *See* Loprest Decl. at ¶¶ 17–25. In his papers, Freedman argues that no monetary sanctions should be imposed because he has resigned from the bar, has psychological problems, and is on the verge on bankruptcy. Other than his declarations, which in the past have ranged

from misleading to completely false, Freedman has not provided me with any evidence that support his pleas for leniency and I do not credit his claims. *See, e.g.,* Undated Rebuttal Affirmation of Paul Freedman at ¶ 5 (stating he cannot afford to pay even $1,000 in sanctions, but not proffering a sworn statement from an accountant or tax records).

■ In awarding attorney's fees as a sanction, the Second Circuit has cautioned that a court should consider the financial circumstances of the sanctioned party. *See* Sassower v. Field, 973 F.2d 75, 81 (2d Cir. 1992) (citations omitted), *cert. denied,* — U.S. ——, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). While I have no doubt that Freedman's income will have dropped if he in fact has resigned from the bar, I note that by Freedman's own admission he was making $778 per hour while he was practicing and I have no credible evidence before me that he did not generate enough assets to justify a reasonable sanction. *See* Declaration of Paul Freedman, sworn to December 14, 1994, at ¶ 4. Nevertheless, I have carefully reviewed the government's papers, and find that its request for attorney's fees is overbroad, and includes expenses for time occasioned by burdensome bureaucratic systems which should not be imposed upon Freedman. I believe a fair sanction, in light of the outrageous course of conduct pursued by Freedman and the resources the government had to expend as a result of such actions, is an award of $2,500.00.

### Conclusion

For the reasons discussed above, petitioner's and respondent's motions for sanctions pursuant to Federal Rule of Civil Procedure 11 are denied. Sanctions, in the form of attorney's fees, are imposed against Paul Freedman pursuant to 28 U.S.C. § 1927 in the amount of $2,500.00. I am also referring this matter to the Grievance Committee of the Southern District of New York. The

---

5. I note that sanctions would also be appropriate under the inherent power doctrine. Because the inherent power doctrine should be used with restraint, I am imposing sanctions under § 1927 because that statute satisfactorily extends to Freedman's conduct.

Clerk of the Court is directed to enter this memorandum opinion and order accordingly.

**SO ORDERED.**