NIKE, INC; Adidas–Salomon A.G.; Adidas International, B. V.; and Adidas America, Inc., Plaintiffs,

v.

TOP BRAND COMPANY LTD.; Rosson Sport, Inc.; Glowerth International Trading Ltd. a/k/a Gloewerth International Trading Ltd.; Transfund Capital, LLC; Hanoch Rosner a/k/a Hank Rosner a/k/a Ike Rosner a/k/a Ikey Rosner; Jay Enis; Vincent Militano; Mark Sahaya; and Mark Stevens Company, Defendants.

No. 00 Civ. 8179(KMW)(RLE).

United States District Court, S.D. New York.

July 3, 2003.

Louis S. Ederer, Bruce A. Schoenberf, Marc J. Jason, Gursky & Ederer, PC, New York City, for Plaintiffs.

Saadia Shapiro, Shapiro & Shapiro, LLP, Brookly, NY, for MHK Products, Inc., Transfund Capital, LLP, and Jay Enis.

Leonard Benowich, Roosevelt, Arfa & Benowich, LLP, White Plains, NY, for Global Surplus, Inc. and Vincent Militano.

Peter L. Berger, Levisohn, Lerner, Berger & Langsam, New York City, for Mark Sahaya, and Mark Stevens and Company,

## OPINION AND ORDER

ELLIS, United States Magistrate Judge.

### I. INTRODUCTION

This action is one of several commenced by plaintiffs alleging large-scale counterfeiting of their branded products. Plaintiffs charge that defendants herein procured and supplied the infringing items. Declaration of Louis S. Ederer (hereinafter "Ederer Decl.") ¶ 2. Plaintiffs filed this action on October 25, 2000, and also filed a motion for a temporary restraining order, a preliminary injunction, and an order for expedited discovery. Ederer Decl. ¶ 11. Following a particularly protracted and contentious period of discovery, plaintiffs have now moved for sanctions against defendants Jay Enis ("Enis"), MHK Products, Inc. ("MHK"), and Transfund Capital, LLC ("Transfund") (collectively, the "Enis Defendants"), and against their attorneys, Shapiro & Shapiro ("Shapiro"). Plaintiffs allege that the Enis Defendants, aided and abetted by Shapiro, made a concerted effort to conceal their involvement in the challenged counterfeiting activities. Specifically, plaintiffs allege that:

> [T]he Enis Defendants and Shapiro have failed to comply with their obligations under the Federal Rules of Civil Procedure

and the direct orders of the Court. Despite the fact that the Enis Defendants orchestrated the manufacture of unauthorized Nike and adidas products, they deliberately chose to conceal their activities by submitting false affidavits, testifying falsely, and wrongfully denying Plaintiffs the right to review any documentation relating to their counterfeiting enterprise. Exacerbating matters, and consequently the expense to Plaintiffs, was Shapiro, which at every turn, attempted to block Plaintiffs' attempts to uncover the truth through threats of sanctions, baseless objections and requests for protective orders, as well as affirmative misrepresentations made to Court regarding the Enis Defendants' conduct.

Plaintiffs' Memorandum of Law in Support of Motion for Sanctions and Costs ("Pl.Mem."), at 2.

Plaintiffs seek in their motion "1) an order requiring the Enis Defendants and/or Shapiro to reimburse plaintiffs the costs and expenses incurred as a result of their misconduct; 2) an order requiring the Enis Defendants and/or Shapiro to pay the attorney's fees expended by Plaintiffs as a result of their misconduct; 3) an order striking the Enis Defendants' answer and a judgment on liability against the Enis Defendants; and 4) an order sanctioning Shapiro for its abusive dilatory conduct." *Id.*

Plaintiffs seek sanctions against the Enis Defendants pursuant to Rules 37(a), (b) and (c) of the Federal Rules of Civil Procedure, and sanctions against Shapiro under Rules 11 and 37 of the Federal Rules of Civil Procedure, and 28 U.S.C. § 1927. Plaintiffs also invoke the inherent power of the Court to punish abusive conduct by parties or their counsel.

For the reasons which follow, the Court finds that Jay Enis and his counsel, Shapiro & Shapiro have engaged in practices which have violated the Federal Rules of Civil Procedure and 28 U.S.C. § 1927. For those violations the Court imposes the following sanctions:

(1) the Enis Defendants will pay the plaintiffs the reasonable attorney's fees and costs associated with the depositions of

Andrew Cancel

Neil Drori

David Feffer

David Jurrist

Paul Owenby

Thomas Parker

Jay Enis (January 2002);

(2) the Enis Defendants will pay the plaintiffs the reasonable attorney's fees and costs associated with the instant motion for sanctions;

(3) the firm of Shapiro & Shapiro will pay the plaintiffs the reasonable attorney's fees and costs associated with the reply memorandum on the sanction motion;

(4) the Enis Defendants are precluded from introducing evidence on the issue of damages;

(5) the plaintiffs will be given all reasonable inferences against the Enis Defendants on the issue of damages.

## II. STATEMENT OF FACTS

### A. The Involvement of Jay Enis with Nike and Adidas Products

On November 14, 2000, District Judge Kimba Wood entered a temporary restraining order, which was subsequently converted into a preliminary injunction and an order for expedited discovery on November 17, 2000. Orders dated November 14 and 17, 2000, attached as Ederer Decl., Exhs. D, E. Among other things, the order for expedited discovery provided:

(D) that Plaintiffs shall have expedited discovery of Defendants as to all the facts and circumstances surrounding Defendants' manufacture, purchase, sale, offering for sale, financing, advertising, promotion and distribution of goods bearing Nike and adidas trademarks, including, but not limited to, the following: a full and complete accounting of Nike and adidas goods manufactured, purchased, offered for sale, sold or distributed; documents reflecting Defendants' manufacture, purchase, sale, offering for sale, advertising, promotion and distribution of goods bearing Nike or adi-

das trademarks; identification of the persons responsible for the manufacture or purchase of the Nike and adidas goods; samples of each type or style of Nike and adidas sporting goods, apparel, or accessories manufactured, purchased and sold by Defendants; and any computer records or electronic data, relating to Defendant's manufacture, purchase, distribution, offering for sale, sale, import, export, financing, advertising or promotion of any Nike or adidas goods;

. . . .

(H) Defendant shall provide sworn statements to Plaintiffs' counsel by 12 noon on Tuesday, November 21, 2000 as to any inventory of adidas or Nike goods in their possession, custody or control, or as to any transactions in adidas or Nike goods currently in process or which are not completed, whether defendants are involved in such transactions as broker or principal; (I) Defendants shall produce to Plaintiffs' counsel and all other counsel who have appeared in this action, by 12 noon Tuesday, November 21, 2000, copies of any transactional documents and correspondence relating to any transactions in Nike are adidas goods in which they have been involved either as broker or principal beginning January 1, 1998 to the present;

. . .

(L) Defendants, by their principals Rosner, Sahaya, Militano and Enis, shall appear for deposition by Plaintiffs during the week of November 27, 2000.

Order dated November 17, 2000, Ederer Decl., Exh. E. Judge Wood thereupon referred the case to the undersigned to supervise discovery.

One of the defendants, Jay Enis, produced no documents pursuant to Judge Wood's expedited discovery order, and did not indicate that his companies were in any way involved with making or distributing Nike or adidas products, or that any of his companies was even in the business of making or selling apparel products. In a declaration signed on November 20, 2000, he stated that one of his companies, MHK, was "engaged in the business of manufacturing and selling promotional specialties to mercantile and various other organizations." Ederer Decl., Exh. F. He asserted that another of his companies, Transfund, was "engaged in the business [sic] providing financing for companies engaged in the manufacturing and selling of all types of merchandise." *Id.* He swore that he had no "knowledge of any transactions in Adidas or Nike goods which are currently in process or which have not been completed," and that he did not have "any transactional document and/or correspondence relating to any of the transactions with Nike or Adidas which are the subject of this litigation." *Id.* At a conference before the Court on November 22, 2000, plaintiffs complained about Enis's response in general, and specifically questioned his use of the phrase "subject of this litigation" because the expedited discovery order required disclosure of transactions "beginning January 1, 1998 to the present." For his part, Enis protested that he was not a proper party to the lawsuit. He did, however, provide a supplemental declaration dated December 14, 2000, in which he stated that he had "no documents reflecting any involvement in Adidas or Nike transactions beginning January 1998." Ederer Decl., Exh. I.

On December 5, 2000, plaintiffs deposed Enis pursuant to Judge Wood's discovery order. Among the things testified to by Enis at his deposition were: (1) he had only provided "financing" for a series of transactions involving Nike and adidas t-shirts; (2) his company, MHK, only provided promotional products for other companies and did not manufacture these items; (3) MHK's screen-printing facility in Hackensack, New Jersey, could only handle "small runs" or limited quantities of t-shirts. Ederer Decl. ¶ 20.

Plaintiffs did not believe that Enis had testified truthfully. In a letter to the undersigned dated December 18, 2000, plaintiffs asserted that testimony given in deposition by Enis and codefendant Mark Sahaya had demonstrated that Enis had been involved in significant deals of Nike products during the relevant time period, and asked the Court to order Enis to appear for a continuation of his deposition:

Mr. Enis was deposed, pursuant to Judge Wood's Order for Expedited Discovery, on

December 5, 2000. At his deposition, Mr. Enis testified that the Enis Defendants had financed the purchase of between 800,000—1,000,000 units of Nike t-shirts by a company known as World Apparel Products from the defendant Rosson Sport (although Mr. Enis claimed that he did not know the t-shirts contained Nike trademarks). Mr. Enis further testified that the Enis Defendants are still owed $1.8 million by World Apparel for these shirts. The shirts in question have been identified as counterfeit. Moreover, at the deposition of codefendant Mark Sahaya held on December 13, 2000, Mr. Sahaya testified that the Enis Defendants had also financed an earlier transaction in 1999 involving 500,000 Nike t-shirts, some or all of which are also alleged to be counterfeit.

Letter from Louis Ederer to Court, dated December 18, 2000 (Ederer Decl., Exh. K).

Enis argued that plaintiffs had mischaracterized the deposition testimony, and again complained that plaintiffs had improperly named him as a defendant:

It is respectfully submitted that this course of conduct has been pursued by the plaintiffs with the sole purpose of harassing our clients. Mr. Ederer's attempt to impress his clients should not occur at the expense of innocent bystanders. The plaintiffs Nike and adidas, who are often the victims of lawless counterfeiters, have extended their deep-pocketed tentacles on a fishing expedition in hope of catching violators. The expedited EBTs were ordered by the Court in order to quickly see if parties like our client Mr. Enis were innocent victims of an overbroad sweeping complaint or true counterfeiters. The EBTs of all of the parties to date have not produced an iota or scintilla of evidence even remotely connecting Jay Enis to the sale, purchase or production of counterfeit goods, and certainly not to the inflammatory remarks and allegations in Mr. Ederer's letter. If such harassment continues, we intend to exercise our right to move the Court to impose the appropriate sanctions against plaintiffs based upon said frivolous and harassing conduct.

Letter from Saadia Shapiro to the Court, dated January 4, 2001 (Ederer Decl., Exh. M).

By letter dated January 16, 2001, Shapiro reiterated the assertion that plaintiffs were engaged in a witch-hunt:

I once again urge you to reconsider pursuing Mr. Enis in this action. His involvement in the transactions alleged in the complaint are even less than those of a bank or investment capital fund. As you can see from the transcript of the depositions, not only with Mr. Enis not involved in the transactions themselves, he didn't even finance these transactions, and as stated his usual business is one of financing transactions for other parties in need of funds. In this case Mr. Enis simply purchased postdated checks (from World Apparel to Roson Sport) as commercial paper at a discount. Mr. Enis was a financier of commercial paper, and these depositions have shown nothing to prove otherwise.

Letter from Saadia Shapiro to Louis Ederer, dated January 16, 2001, Ederer Decl., Exh. O.

While the testimony elicited up to this point did not clearly show Enis's role in the transactions at issue, it did indicate that Enis had knowingly been involved in transactions with other defendants in this lawsuit. Notwithstanding these obvious links to the subject transactions, Enis continued to argue that there was no reasonable basis to have, or keep, him in the case. The Court declined to issue an order to compel the production of documents, as plaintiffs had not demonstrated that Enis actually possessed, or was in control of, any relevant documents. The Court, however, did allow plaintiffs to conduct additional discovery to explore whether Enis's representations concerning his role in the counterfeiting schemes were false.

Plaintiffs spent a significant part of the next year gathering evidence from third parties in an attempt to show that the Enis Defendants were not innocent bystanders swept up in an overbroad discovery net cast by plaintiffs, but major players at the center of a multi-million dollar counterfeiting enterprise involving adidas and Nike goods. Ed-

erer Decl. ¶¶ 34–73. Enis continued to complain about improperly being made a party to this lawsuit.

On November 15, 2001, plaintiffs presented the Court with their accumulated evidence, and renewed their request to re-open the Enis deposition. Ederer Decl. ¶ 74. This evidence included:

    a. David Jurrist, account manager for Perfect Courier, a shipping and warehousing company in Brooklyn, testified that he had picked up two to three million Nike or adidas t-shirts from MHK (Ederer Decl., Exh. HH, p. 23, lines 4–13);

    b. Andrew Cancel, a truck driver for Perfect Courier, testified that he had made approximately 150 pickups of Nike and adidas t-shirts at the MHK facility in Hackensack between 1998 and 2000 (Ederer Decl. Exh. II, p. 24, lines 4–11), and that he had observed Nike and adidas t-shirts being screen-printed and packed into boxes during each of these pickups (*Id.* p. 21, line 7 to p. 22, line 7);

    c. Thomas Parker, a partner of Volunteer Knit Apparel, Inc. ("Volunteer"), testified that his company manufactured "blank" Nike t-shirts for approximately three years, shipped them to the Hackensack facility, and Enis paid for the them (Ederer Decl., Exh. NN, p. 31, line 23 to p. 33, line 14);

    d. Paul Owenby, owner of The Owenby Company ("Owenby"), testified that his company manufactured Nike and adidas products for approximately three years, and that these products were shipped to, and paid for by, Enis. (Ederer Decl., Exh. LL, p. 32, line 19 to p. 32, line 9).

In addition, plaintiffs secured bank records of Enis's companies which showed millions of dollars in payments to Volunteer and Owenby, Ederer Decl., Exh. W, and more than a thousand pages of transactional documents from the third-party witnesses, many of which were transactional documents relating to the adidas and Nike goods manufactured for and shipped to the Enis Defendants.

Based on this evidence, plaintiffs requested an order compelling Enis to appear for a continued deposition, and compelling the Enis Defendants to produce information regarding the location of former MHK warehouse manager, Billy Wilson ("Wilson"). In early December 2001, plaintiffs supplemented this application by seeking leave to take the deposition of a recently discovered label manufacturer named Sandora Industries, Inc. ("Sandora"), which plaintiffs believed had been engaged by Enis to create Nike and adidas neck labels and hangtags for counterfeit garments. Ederer Decl. ¶ 77.

After receiving these submissions, and following a hearing on December 10, 2001, the Court determined that Enis had acted in significant ways apart from mere financing, and had been implicated in transactions challenged in this action, and therefore ordered him to appear for a continuation of his deposition. The Court also granted plaintiffs leave to take the deposition of Sandora, instructed Enis to produce any documents in his possession relating to Nike and adidas goods and any information which would assist plaintiffs in locating Wilson.

Plaintiffs thereupon took the deposition of Neil Drori, president of Sandora, on January 11, 2002. Drori testified that Enis had personally ordered the manufacture of millions of Nike and adidas t-shirt labels, that Enis had provided the samples, and approved the specifications; that the labels and hang tags were shipped to MHK and Volunteer; and that these items were billed to, and paid for by, MHK. Drori also testified that he had visited the MHK facility in Hackensack, New Jersey, and witnessed the screen printing of large quantities of Nike and adidas t-shirts.

At his continued deposition on January 24, 2002, Enis painted a remarkably different picture from that set forth in his declarations and his prior deposition. Among other things, he admitted that:

    a. He personally ordered millions of Nike and adidas labels and hang tags from Sandora (Deposition of Jay Enis, dated January 24, 2002 (Ederer Decl., Exh. XX) [hereinafter, "Enis 2002 Dep."], p. 18, lines 15–25);

    b. He personally supplied Sandora with sample Nike and adidas labels and hang tags and instructed Sandora to duplicate

them (*Id.*, p. 20, line 14 to p. 21, line 25; p. 33, lines 10–19);

c. He personally required Sandora to send pre-production samples of the labels and hang tags back to him so that they could be compared with what he had sent (*Id.*, p. 21, line 10 to p. 22, line 8);

d. He personally directed that the Nike and adidas labels and hang tags produced by Sandora be shipped to the MHK facility in Hackensack, New Jersey, or directly to Volunteer (*Id.*, p. 18, lines 14–22; p. 45, lines 3–25);

e. He took delivery in Hackensack directly from volunteer and Owenby of "blank" Nike and adidas t-shirts with the Sandora labels sewn into the garments (*Id.*, p. 63, lines 6–8; p. 64, line 10 to p. 66, line 7);

f. At the MHK facility in Hackensack, he screen-printed Nike and adidas logos onto the t-shirts which he received from Volunteer and Owenby, (*Id.*, p. 77, lines 5–21);

g. He attached the hang tags produced by Sandora to the screen-printed t-shirts at the MHK facility in Hackensack (*Id.*, p. 125, lines 1–6)

With respect to his failure to produce any documents relating to these transactions that had been produced by third parties, Enis testified and provided a sworn affidavit stating that "[s]ometime prior to June 2000, the MHK premises had a major roof leak and many of the papers in its offices became wet and were discarded." Ederer Decl., Exh. YY.

## B. The Bill Wilson Deposition

In a typical case, the deposition of Bill Wilson would have been a minor issue, perhaps even an unnecessary expenditure of discovery resources. It assumed a heightened status, due in large part to Enis's representation that he had ceased being actively involved with MHK since about 1999, and that Wilson was responsible for the day-to-day operations at the facility. The parties have different recollections about the history of this dispute, but the situation began to gain momentum when, on March 16, 2002, plaintiffs' counsel faxed a notice to depose Wilson to Shapiro. Ederer Decl., Exh. X. Shapiro objected to the form of notice and the date selected for the deposition:

Reference is made to your facsimile transmission dated March 16, 2001, which contained a Notice of the Deposition of Bill Wilson. Please be advised that we have not consented to service of documents in this manner via facsimile and do not accept such service. With respect to any deposition of our clients in this matter, April 6, 2001 is the eve of the holiday of Passover and the attorneys from our office, as well as our client, are not available on that day. Please contact our office to discuss scheduling the deposition at a mutually convenient date and time before April 5 or after April 17, 2001.

Facsimile letter from Debbie Z. Benasaraf to John Maltbie, dated March 26, 2001 (Ederer Decl., Exh. Y). On the same day as the fax, counsel for plaintiffs contacted Shapiro and the deposition was rescheduled to April 4, 2001. Ederer Decl., Exh. Z. Three days later, Shapiro again complained to the Court:

Shortly after this matter was commenced in or about November, 2000, the Court ordered expedited discovery in this matter since the Court was sensitive to the fact that the temporary restraining order would have a profound impact on the ability of the defendants to run their businesses. Depositions of the defendants were taken documents were produced, however, this process has been anything but expedited; **it has been ongoing for over four months.** Plaintiffs have been permitted to proceed on a veritable unfettered "witch hunt" and fishing expedition against the defendants, including my clients, during that time, and throughout the discovery plaintiffs have not come up with a "smoking gun" which involves my clients are anything substantive at all to support their case against my clients in this matter.(emphasis in original)

Letter from Saadia Shapiro to Court, dated March 29, 2001 (Ederer Decl., Exh. AA). It is not clear from the record exactly what happened during the next few months, but Shapiro subsequently agreed to schedule the deposition for September:

We have consulted with our client, and September 12, 13 or 14, 2001 have been proposed as dates for the deposition of Bill Wilson. Please get [sic] choose one of these dates and get back to us so that we may schedule the deposition.

Facsimile letter from Debbie Z. Benasaraf to John Maltbie, dated August 14, 2001 (Ederer Decl., Exh. CC). As occurred in March, Shapiro wrote the Court shortly after the deposition was scheduled to complain about the course of discovery:

This firm was discouraged that "expedited discovery" had turned into an over eight month process with no conclusion to discovery set by the Court and this surely was not the intention of Judge Wood. During the conference, counsel for plaintiffs expressed that all that remains for their discovery to be complete was the deposition of Bill Wilson, one of the employees of MHK Products, and possibly one other deposition. The Court ordered that the deposition of Bill Wilson could take place but that no other or further discovery could be conducted absent further application to the Court.

Letter from Saadia Shapiro to Court, dated August 28, 2001 (Ederer Decl., Exh. DD). The plaintiffs responded in kind:

Mr. Shapiro conveniently neglects to mention in his letter that immediately after the July 12 conference call, plaintiffs proceeded to notice the depositions of all parties they had intended to pursue after Wilson's deposition had been completed. On July 24, 2001, this office sent notices of deposition via Federal Express to opposing counsel for the depositions of Perfect Courier, Volunteer, Owenby, Volunteer [sic], and Y-Z and Complete, as well as another related Florida entity, HYZ Enterprises, and an officer of the related Florida entities, David Feffer.

. . . .

Mr. Shapiro did not comply with the court's order to provide dates for the deposition of Wilson until August 14, 2001, when he offered Wilson for deposition on September 12, 13, or 14, 2001. Further, directly contradicting Mr. Shapiro's letter, on August 15, 2001 plaintiffs informed Ms.

Benasaraf, that plaintiffs would take the deposition of Wilson on September 14, 2001. For this entire period, July 25, 2001 to August 28, 2001, Mr. Shapiro never objected to the taking of any of these depositions.

Mr. Shapiro raises these objections at this late date only because he desperately wishes to conceal the true nature of his clients' involvement in a counterfeiting scheme of massive proportions. Based on what plaintiffs now though, and what we believe will be demonstrated in the depositions, defendants MHK and Enis were instrumental to this scheme.

Letter from Louis Ederer to Court, dated September 4, 2001 (Ederer Decl., Exh. EE). Shapiro asserted that the plaintiffs had failed to confirm a date for the deposition:

Furthermore, despite Mr. Ederer's claims, his office never attempted to confirm the date for Wilson's deposition until the September 4, 2001 letter to the Court. This office provided three dates for Wilson's deposition on August 14, 2001. Although other deposition were confirmed, the plaintiffs never chose a date for the Wilson deposition, despite a repeated verbal request by Debbie Benasaraf to John Maltbie of Gursky & Ederer on August 15, 2001 to schedule the deposition.

Letter from Saadia Shapiro to Court, dated September 6, 2001 (Ederer Decl., Exh. FF). Despite these professed attempts to schedule the Wilson deposition, Shapiro revealed in November that they did not know where Wilson was, and that Enis had had no communication with him since late July, or early August:

It is patently scandalous that you that you [sic] have managed to so completely twist the facts so as to distort the truth of this matter in a blatant attempt to position yourself to seek yet another extension of discovery from the Court. The fact is, that in late Spring of 2001, due in part to the injury to its reputation perpetrated by your client through this litigation, MHK Products was forced to cease its operations and terminate all of its employees. At the time, MHK was operating with a skeleton staff, with Bill Wilson running its office.

As you are also where, years earlier, our client Mr. Enis moved to Florida and no longer was involved in the day to day operations of MHK on its premises. Nevertheless, notwithstanding that all employees of MHK *including Mr. Wilson,* had been discharged, as Mr. Enis was aware of the subpoena served by your firm, he undertook to prevail upon Mr. Wilson to comply and attend.

Unfortunately, since shortly after our last communication regarding scheduling dates for the deposition in late July, early August of this year, Mr. Wilson has rebuffed and evaded all attempts by Mr. Enis to communicate with him, regarding this or any other matter, despite Mr. Enis's diligent efforts to do so. Mr. Enis has advised us that he did not handle employee records of MHK, that task for by Mr. Wilson, and that he does not have access to any of these records in Florida.

Letter form Debbie Z. Benasaraf to John Maltbie, dated November 14, 2001 (Ederer Decl., Exh. GG) (emphasis in original). Enis subsequently testified at his deposition in January 2002 that he had not spoken to Wilson in six to nine months, that he had no phone number for Wilson, and that he was not sure where Wilson lived. Enis 2002 Dep., p. 107, line 3 to p. 109, line 20.

## C. The Enis Defendants' Position

The Enis Defendants assert that there is no basis for sanctions against either them or Shapiro:

> In the case at bar, the facts of this matter do not at all point to an award of sanctions either against the Enis Defendants or the law firm of Shapiro & Shapiro. As set forth at length in the Enis Affidavit and the Shapiro Declaration, **there was absolutely no violation of any order of this Court regarding discovery as Mr. Enis maintains, until this very day, that there were no documents within his custody or control which should have been produced which were not produced.** In addition, Mr. Enis maintains that the affidavits he submitted in connection with this matter were all true, and that he did not make any knowingly false statements in either of his depositions. The plaintiffs

have not proven and cannot prove otherwise.

Enis Defendants' Memorandum of Law in Opposition to Motion for Sanctions and in Support of Cross–Motion for Sanctions, at 6 (emphasis in original). They maintain that (1) Enis had no documents to produce; (2) Enis made no knowingly false statements in his affidavits or in his depositions; and (3) Shapiro did not act in any manner inconsistent with the Federal Rules of Civil Procedure. Indeed, the Enis Defendants argue that sanctions are warranted against plaintiffs' counsel for filing a motion for sanctions. According to Shapiro,

> Upon information and belief, based upon the foregoing, it seems that their motion for sanctions was made in order to further harass the Enis Defendants, in violation of Rule 11(b). Unless the Ederer firm is willing to withdraw the motion for sanctions, such should subject the Ederer ever firm to sanctions, including, but not limited to, the costs and attorneys fees of the Enis Defendants in defending the motion for sanctions and bringing the cross-motion for sanctions against the ever firm.

*Id.* at 13.

## III. DISCUSSION

### A. Applicability of Rule 37(a)

■ Federal Rule of Civil Procedure 37(a) provides that "[i]f a party fails to make a disclosure required by Rule 26(a)," or provides "an evasive or incomplete disclosure, answer or response," "any other party may move to compel disclosure and for appropriate sanctions." FED. R. CIV. P. 37(a)(2)(A), 37(a)(3). "If the motion is granted ... the court shall ... require the party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees...." FED. R. CIV. P. 37(a)(4)(A).

Plaintiffs point to three alleged failings by Enis which justify sanctions under this provision of the Rules: (1) he did not provide any documentary evidence of his transactions

with Nike or adidas goods; (2) he did not provide accurate and complete responses in his November 20, 2000, and December 14, 2000 affidavits; and (3) he did not testify truthfully and completely in his December 5, 2000 deposition regarding his involvement in Nike and adidas products.

Plaintiffs allege that Enis knew that he had been less than candid in his declarations concerning the existence of documents, and that his deposition testimony was false. Plaintiffs assert that, rather than acknowledging his true role in the challenged transactions, Enis sought to conceal his involvement, and to attack plaintiffs for asserting well-founded claims against him.

### 1. Documentary Evidence

Plaintiffs reasonably assumed that because third parties had myriad documents concerning the subject transactions, and involving large sums of money, Enis must have had some documents in his custody or control. Initially Enis had two answers to this line of inquiry. First, he maintained that he was merely a financier, and had no need for the kind of transactional documents sought by plaintiffs. Second, he was an "absentee owner" and Bill Wilson was the individual operating the business on a day-to-day basis. In his December 2000 deposition, Enis presented himself as a man who was primarily retired, and occasionally stepping in when his personal touch was needed:

Q: How many employees does MHK have today?

A: Three.

Q: And who are they?

A: Mr. Bill Wilson, a Mr. Raoul Salvador and a Mr. Jeff—Jeffrey Williams.

Q: What do those gentlemen do at MHK?

A: They're involved in the taking of orders, processing and shipping.

Q: What's your involvement in MHK over, say, the last two years?

A: Substantially, and absentee owner.

Q: Isn't it fair to say that your employees, the three people you mentioned, have the authority to take orders without your approval?

A: Within certain limits, I would say that's accurate.

Q: Are there some transactions that you get involved in personally?

A: Some. If they are associates are acquaintances of mine, those people might call me as opposed to wanting to speak to someone at the, quote, lower level. If they want a better price, let's say.

. . . .

Q: Let me back up a little bit. When you said that your role was substantially an absentee owner, can you be a little more specific about what you do in that role?

And the question is, how often do you talk to people at the office? Do you receive documents from them? Just what is your participation in the business, other than what we've already talked about, with respect to larger orders that would need your involvement?

A: That's my participation. I live in Florida. I largely am involved in financing. I'm not a big business. I tried to earn enough money to support my family. And I'm not looking to be rich.

. . . .

Q: Do you receive a financial statement every month?

A: Every quarter.

Q: Do you receive any other documents on a regular basis from MHK?

A: No.

Q: Is there someone at MHK who is responsible for preparing and sending you those quarterly statements?

A: No.

Deposition of Jay Enis, dated December 5, 2000 (Ederer Decl., Exh. J) [hereinafter, "Enis 2000 Dep."], p. 22, line 6 to p. 25, line 14. Despite these protestations in 2000, when it became clear that a significant number of documents did in fact exist, Enis blamed his failure to produce documents on a flood at the MHK facility in Hackensack, not on his limited role as financier. This convenient excuse might be more credible if it had at least been alluded to at some earlier time in the discovery process. There is a material difference between denying possession of documents and claiming that documents were

destroyed. If Enis had responsive documents at MHK which had later been destroyed, the Federal Rules of Civil Procedure required him to advise plaintiffs. Neither his November, 22, 2000 declaration nor his December 14, 2000 declaration acknowledged possession of such documents. The Court need not find that Enis actually had any transactional documents at the time of his response. His failure to admit that he once had them was "evasive and incomplete" at best, and designed to hide the extent of his involvement in suspect transactions.

Plaintiffs' evidence conclusively establishes that, for at least a period of three years, Enis was not only aware of, but was at the center of the production of massive quantities of Nike and adidas goods.[1] He ordered and paid for Nike and adidas neck labels and hang tags, ordered and paid for "blank" Nike and adidas t-shirts, screen-printed Nike and adidas logos onto the t-shirt at his facility in Hackensack, applied the hang tags, and delivered those goods for shipment to World Apparel.

### 2. Knowledge of Ongoing Transactions Involving Nike and Adidas Goods

Enis maintained for more than a year that he had no knowledge of such transactions. He swore to that fact in his affidavits, and misled plaintiffs in his first deposition. He knew at the time he made these statements that 1) he was owed $1,700,000 by World Apparel for Nike and adidas goods; 2) that he owed Volunteer approximately $145,000 for its manufacture of "blank" Nike and adidas t-shirts; and 3) that he also owed Sandora approximately $100,000 for its manufacture of Nike and adidas labels. These transactions were clearly "in progress" or "not completed." The failure to disclose them immediately is sanctionable.

### B. Applicability of Rule 37(b)

■ Federal Rule 37(b) provides that "[i]f a party or an officer, director, or managing agent of a party ... fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule ..., the court in which the action is pending may make such orders in regard to the failure as are just...." FED. R. CIV. P. 37(b)(2). The rule sets forth certain specific orders which may be imposed for violations. In addition to, or in lieu of these specified orders, "the court shall require the party failing to obey the order or the attorney advising that party or both to pay the reasonable expenses, including attorney's fees, caused by the failure...." *See* FED. R. CIV. P. 37(b)(2). Plaintiffs allege that Enis violated Judge Wood's order for expedited discovery. According to the order, Enis was required to provide "a full and complete accounting of his involvement in any transactions involving Nike and adidas goods." Plaintiffs allege that Enis did not give a "full and complete accounting" because his affidavits and first deposition failed to disclose the extent of his involvement in Nike and adidas deals. The Court agrees. He and the companies he controlled did significant business in Nike and adidas products during the relevant time period. Even if Enis were not aware that he was dealing in counterfeit goods, his stonewalling would have run afoul of Judge Wood's order. Whether he was a guilty party hiding from his bad acts or an innocent party seeking to avoid unwarranted inferences, he knowingly and brazenly violated the Court's discovery order.

In his sworn statements, Enis did not acknowledge that MHK was in the business of screen-printing. In his first deposition, he suggested that MHK was a small operation with limited production capabilities:

Q: What kind of—you referred to my example as being a small run. At what point does it get to be too many T-shirts for MHK to make them themselves?

A: At the point that the customer's request, time line-wise, is more than the capacity of the equipment. Let me be very specific. If you wanted 10,000 shirts and you wanted it delivered over a year, MHK could produce it. If you wanted it

---

1. Plaintiffs assert that these items were counterfeit. For purposes of the motion, the Court need not reach that question. Judge Wood's Order required the Enis Defendants to give a complete account of their dealings in Nike and adidas goods. This they failed to do.

produced over a week, MHK probably could not produce it.

Q: If I wanted 10,000 shirts and I wanted them in a week, would MHK source that to a domestic company, or is that the kind of thing you would send overseas?

A: No. You wouldn't send it overseas. You would source it domestically.

Enis 2000 Dep., p. 41, line 16 to p. 42, line 8. Before the second deposition, plaintiffs secured the testimony of Neil Drori, the president of Sandora, which had manufactured t-shirt labels for MHK. Drori testified that Enis "was screen printing and producing blanks" for t-shirts "for a licensee in Israel" and that he had seen Nike and adidas products packed in cartons at the Hackensack facility. Deposition of Neil Drori (Ederer Decl., Exh. WW) ("Drori Dep."), p. 31, line 20 to p. 34, line 22.

In his 2002 deposition, Enis conceded that he had extensive dealings with Drori concerning Nike and adidas t-shirts from 1998 to 2000:

Q: Are you aware that Mr. Drori testified that over a period of three years, from 1998 to 2000, that you, Jay Enis, personally contacted him and ordered millions of Adidas and Nike T-shirt labels?

A: I'm not aware of his testimony, but I'm certainly aware that that is absolutely correct.

Q: So Mr. Drori wasn't lying when he testified to that effect, correct?

A: Not at all.

Enis 2002 Dep., p. 18, lines 15–25. Drori's testimony was backed by documents from the company files. When confronted with an exhibit from the Drori deposition, Enis conceded some of the obvious, but had trouble remembering important information:

Q: Do you have Exhibit 6, Mr. Enis?

A: I do.

Q: Do you recognize the handwriting?

A: I do.

Q.: Is it yours?

A.: Yes.

. . . .

Q: Is this a note that you sent to Mr. Drori on or about May 10th of 2000?

A: Yes.

Q: Does this note refer to Nike labels?

A: I can't tell from the letter.

Q: Well, the letter says "the first million or so goods have been cut and the total size scale is as follows" and then there's a breakdown of sizes. Do you see that?

A: I do.

Q: You wrote this note. Were you referring to a million or so labels?

A: I believe so.

Q: Did you ever order from Mr. Drori or his company a million labels of anything other than Nike labels?

A: Don't recall.

Q: Did you ever order from Mr. Drori anything other than Nike or Adidas labels or hang tags?

A: I don't recall.

Q: Sitting here today, you can't recall whether you ever ordered a million or any labels other than Nike labels from Designers Circle?

A: I don't believe I ordered a million of a label other than a Nike label from Mr. Drori.

Q: And the labels that are referred to in this letter, were these labels invoiced to you or your company?

A: If they were shipped.

Q: Where they shipped to MHK?

A: I doubt it.

Q: Are you saying that no Nike labels or Adidas labels that you ever ordered from Designers Circle were ever shipped to MHK?

A: I didn't say that.

Q: Were they?

A: There could have been some labels that were shipped to MHK by—in error, but as a general rule, there would be no reason to ship any labels to MHK.

Q: That's because the labels needed to be inserted into blank T-shirts, correct?

A: That's right.

Q: And the insertion into blank T-shirts was not done at the MHK facility; is that correct?

A: It was not done by MHK, period.

Q: It was not done at the MHK facility?

A: Right.

Q: It was done at a T-shirt manufacturer?

A: Yes.

Enis 2002 Dep., p. 43, line 11 to p. 45, line 25. Drori also testified that Enis had directed that the letters "N" and "A" be used instead of the names Nike and adidas on the packages being shipped:

Q. There's a couple of notations in here relating to N brand or A brand; do those just simply relate to Nike or Adidas?

A. That's correct.

Q. Was there any reason for using those designations that you recall?

A. Yeah, actually. At some point after we started doing business, Jay asked us not to put—typically when we package a finished product, we'll put a sample on the outside and all of the order reference numbers that we use internally, so that afterwards if there's a problem with the product, we can audit it, you know, exactly which product run it came from. You know, the normal production control things you would want to do. Jay asked us to stop doing it, because he was afraid—what he told me was he was afraid of shrinkage in transit. He was afraid people would steal boxes right off the truck. That's not altogether unheard of. I've seen—I've had product disappear in transit to clients before. So it didn't strike me as being an odd request. In considering the brands involved in the products that we were shipping, it made sense to me.

In order to make that flow through our system easily, we started using the N and the A designations in order entries, so that's the only thing that appeared when it hit shipping, and that's the only thing that they could use as a reference point when they were documenting the boxes. That way it wasn't obvious to the world what the situation was.

Drori Dep., p. 52, line 12 to p. 53, line 16. Although Drori suggested an innocent explanation for not using the actual names, a reasonable inference is that Enis was trying to conceal the nature of his dealings. Perhaps recognizing the possible adverse conclusions which could be drawn, Enis denied even having a discussion about the use of letters instead of names:

Q: Do you recall having received at 204 Railroad Avenue in Hackensack Nike or Adidas labels that were manufactured by Designers Circle?

A: Hang tags, yes, but not necessarily this specific invoice.

Q: Now, in the description—and, again, I'm not representing as your counsel pointed out, I have no idea whether this invoice relates to the document that it's attached to, but in the description of what's being shipped, it says "PTD."

Do you know what that refers to, PTD.?

A: No, I do not.

Q: It says N Blank, hang tags. I think it's N Brand hang tags, I think it should be. Do you see that?

A: I do.

Q: Do you know what N refers to?

A: No.

Q: Does it not refer to Nike?

A: It could.

Q: Did you ever give instructions to Mr. Drori that on invoicing Nike invoices and labels he should refer to the brand name as N rather than Nike?

A: No.

Q: Did you ever tell Mr. Drori that in invoicing Adidas labels or hang tags that he should refer to the hang tags and labels as A rather than Adidas?

A: No.

Enis 2002 Dep., p. 31, line 8 to p. 32, line 15. Enis, however, was forced to admit that he was concerned enough to talk with Drori before Drori was deposed by plaintiffs:

Q: Did you do business with Mr. Drori in the period of 1998 to 2000, let's say?

A: Yes, I did.

Q: Are you aware, Mr. Enis, that Mr. Drori testified in a deposition in this case, just a few weeks ago?

A: Yes.

Q: And isn't it also true that you contacted Mr. Drori just a few days before his deposition to talk to him?

A: Yes.

Q: And what did you say to him?

A: I said to him that I understood that he was going to be deposed and that, in fact, just wanted to—people tend to get nervous when they are brought in on a subpoena for a deposition and wanted just to know what, in fact, would be said, because my firm owed Mr. Drori's firm money and they had—I was concerned that they would, in fact, interpret the relationship inappropriately as a means of getting even for the monies that were owed to them.

Q: That's what you said to him, or that's what you were thinking?

A: Not in so many words. What I said to him was Neil, what is it that you are intending to say, and he said I was told by counsel not to discuss anything with you and I said to him, I'm not asking you to do anything other than tell the absolute truth. I'm asking as someone who had a relationship with you, in fact, the fact that my firm owed you money was going to in any way influence what you were going to say.

Q: What did he say?

A: He said, I will only tell the truth. I don't believe that the truth has any negative bearing on you or your company and I would not influence the truth by virtue of any debt that was owed.

Enis 2002 Dep., p. 16, line 21 to p. 18, line 11. Enis also talked to another third-party witness before that witness was deposed by plaintiffs:

Q: Do you know Mr. Tom Parker of Volunteer?

A: Not well.

Q: Do you know him?

A: I believe I've met Tom Parker on one occasion.

Q: Did you ever speak to him on the phone?

A: Yes.

Q: Okay. Are you aware that Mr. Parker testified in a deposition in this case?

A: Yes.

Q: Have you read that deposition?

A: No.

Q: Have you spoken to Mr. Parker about this case?

A: In what sense?

Q: In any sense.

A: Only to the degree that he was being deposed.

Q: Okay—

A: I couldn't tell you if Mr. Parker instituted the call. I believe he did. I doubt if I instituted the call.

Q: Did he institute a call to you, or you to him after he was subpoenaed to be deposed?

A: I believe that's when the call came.

Q: But before he was deposed?

A: I don't recall.

Q: Did you speak to him before he was deposed our after he was deposed?

A: I've not spoken to Mr. Parker since he was deposed.

Q: So you spoke to him before he was deposed?

A: Before.

Q: What did you speak about, his upcoming deposition?

A: Yes.

Q: What did he say to you?

A: Simply was there anything that I knew about why he was being subpoenaed to be deposed.

Q: What did you say to him?

A: I said, "I would assume that you're being deposed because we transacted business. I sent you checks, and that relative to sending those checks, you, in fact, would be deposed."

Q: That's what you said to him?

A: Um-hum.

Enis 2002 Dep., p. 59, line 25 to p. 62, line 2. Although Enis attempted to portray these contacts as innocent, they betray a clear awareness on his part that he was implicated in the claims set forth in this case. Yet, he continued to protest that he was unfairly targeted by plaintiffs.

Forced to establish Enis's knowing involvement in transactions of Nike and adidas goods, plaintiffs secured testimony from other actors in the chain of activity. For example, they deposed David Jurrist, the account manager for Perfect Courier, who testified that his company picked up more than a million Nike and adidas t-shirts at MHK:

Q: Did you ever receive instructions from either Billy Wilson or Jay Enis as to making any of these hundred somewhat deliveries COD?

A: Yes.

Q: How would they give you that information?

A: When they called in the pickup, they would say deliver it and pick up a check for so and so.

Q: Then that information would be relayed to whom?

A: The driver.

Q: What, if any, arrangement did you have with Jay Enis regarding the picking up of these COD payments?

A: No arrangement except return them as soon as possible. Excuse me, and not deliver the merchandise unless I got a check.

Q: So upon receiving the check, what did you do with the check?

A: Well, if it wasn't late in the day, and Andy could get back over, they'd drop the check off at MHK. If it was late or they had something so [sic] do, this way they would bring it in the morning, and then either mail it to them or going back the next day, they'd take it to them.

. . . .

Q: If you had to estimate how many Nike and Adidas T-shirts were picked up—well, let's back up. Of the hundred plus pickups, approximately how many boxes were picked up of Nike and Adidas T-shirts from MHK?

A: I would say anywhere between 75 and a hundred thousand, I would imagine. Just guessing.

Q: So what would you estimate would be the number of T-shirts that we're dealing with, with the Nike and Adidas trademarks?

A: Upward of 2, 3 million.

Deposition of David Jurrist (Ederer Decl., Exh. HH), p. 21, line 20 to p. 23, line 13. In his 2002 deposition, Enis acknowledged that MHK had screen printed large numbers of t-shirts, though he conceded only that the number was approximately 100,000 to 200,-000.

Q: Do you deny that MHK took these Nike blanks that were delivered at 204 Railroad Avenue and screen printed them with Nike logos?

A: No.

Q: You don't deny that?

A: I do not deny that.

Q: So, in fact, MHK did screen print Nike logos on to blank Nike T-shirts at 204 Railroad Avenue in Hackensack; is that correct?

A: That's correct.

Q: When did that happen?

A: I told you I'm not good with time lines, but certainly there's a correlation between the dates that the blanks were shipped in by Volunteer and the dates—to the degree that what they shipped in was a Nike T-shirt, that it was printed at that facility.

Q: And you admit that 100,000 to 200,000 of those T-shirts were so screen printed. Would you agree with that?

A: I estimated that quantity, yes.

Q: Do you know for fact that there were more than 100,000 to 200,000 Nike T-shirts screen printed at the facility?

A: No.

Q: Do you know whether any Adidas blanks were screen printed with Adidas logos at the MHK facility?

A: Yes.

Q: Was that in the same general time period we're talking about, '98 to 2000? I'm not trying to pin you down to a date here.

A: It could have been.

Enis 2002 Dep., p. 77, line 5 to p. 78, line 14.

## C. Applicability of Rule 37(c)

■ Federal Rule 37(c) provides that "[a] party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not ... permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed." FED. R. CIV. P. 37(c)(1). Further, Rule 37(c) states that "[i]n addition to or in lieu of this sanction, the court ... may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C)...." *Id.*

Plaintiffs argue that the Enis Defendants' continued failure to disclose and refusal to admit information at the outset, and their failure to set the record straight for more than a year, subjects them to sanctions under Rule 37(c). The Court agrees that such behavior violates subsection (c). The typical sanction would be to preclude the use of the evidence which has not been disclosed. Here, however, there appears to be no value in preventing the Enis Defendants from using the evidence, since the evidence would have helped plaintiffs establish the extent of their damages. Because the Enis Defendants have totally failed to provide relevant data, plaintiffs' ability to present their case has been impaired. It therefore is appropriate that the sanction address the impact of the violation. The Court finds that appropriate remedies include those suggested by plaintiffs, and hereby orders that: (1) the Enis Defendants be precluded from introducing evidence on the question of damages; (2) plaintiffs be given all reasonable adverse inferences against the Enis Defendants on the issue of damages; and (3) plaintiffs be paid reasonable attorney's fees for having to gather what information they have been able to marshall. *See Artmark–Chicago, Ltd. v. E. Mishan & Sons, Inc.,* 1992 WL 265903 (N.D.Ill.).

## D. Applicability of Rule 11

■ Federal Rule 11(b) provides that "[b]y presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney ... is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

. . . .

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

FED. R. CIV. P. 11(b).

Rule 11(c) provides that "[i]f, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may ... impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." FED. R. CIV. P. 11(c). Further, Rule 11(c)(2) states that such a sanction "may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." FED. R. CIV. P. 11(c)(2). Under Rule 11, the Court may sanction an attorney, a client, or both based on the submission to the Court of a pleading, motion, or other paper in a lawsuit. *See Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 541, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991); *United States v. International Brotherhood of Teamsters, Chauffeurs. Warehousemen and Helpers of*

*America, AFL–CIO,* 948 F.2d 1338, 1344 (2d Cir.1991); *Tedeschi v. Smith Barney, Harris Upham & Co., Inc.,* 579 F.Supp. 657 (S.D.N.Y.1984) (attorney's conduct including making frivolous motion and seeking reargument of decided motions warranted sanctions under both Rule 11 and 28 U.S.C. § 1927).

Plaintiffs specifically seek damages against Shapiro. The plaintiffs' position is summed up in the following passage from their memorandum of law:

"From the inception of his involvement in the instant action, Shapiro has either failed to make reasonable inquiry into the facts, or, more likely has made such inquiry and discovered the true facts, but then misrepresented them to the Court. Either way, throughout these proceedings, Shapiro has done everything possible to perpetuate Enis' initial testimony that Enis was not involved in manufacturing adidas and Nike t-shirts, and then to block Plaintiffs from taking additional discovery. Shapiro repeatedly, and without regard to the instructions of the Court, tried to cut off discovery in this case before Plaintiffs could complete their third party discovery and learn the truth."

Pl. Mem. at 28–29.

While plaintiffs have quite appropriately raised questions about Shapiro's behavior during this litigation, they have failed to identify any specific "pleading, written motion, or other paper" which violated the Rule. They correctly point out that Shapiro continued to maintain the fiction that Enis simply did not belong in this lawsuit, sought to curtail discovery, and continually threatened plaintiffs' counsel. Though Rule 11 is effective in curtailing certain behavior, it does not reach all abusive conduct by counsel. "The rule applies only to assertions contained in papers filed with or submitted to the court." 1993 Amendments, Advisory Committee Notes. Much of the alleged offending behavior by Shapiro consists of the letters and other communications between plaintiffs counsel and the Shapiro firm. While there is some authority to support Rule 11 sanctions for letters written by counsel, the court finds that the letters in this case are not the type of submission contemplated by the rule. *See*

*In re Highgate Equities, Ltd.,* 279 F.3d 148, 153–54 (2d Cir.2002). Similarly, representations made by counsel in conferences, before the court, even if inaccurate, are not subject to Rule 11 sanctions unless presented in conjunction with an offending filing. *O'Brien v. Alexander,* 101 F.3d 1479, 1490 (2d Cir.1996).

There is, however, one submission by Shapiro which violates Rule 11, the response filed in opposition to plaintiffs' motion for sanctions. Specifically, the Court finds that Shapiro's cross motion for Rule 11 sanctions is sanctionable. There is no reasonable basis on which Shapiro can maintain that the motion filed by plaintiffs' counsel violates Rule 11. First and foremost, the record established by plaintiffs' counsel fully supports their claim that the Enis Defendants and Shapiro have engaged in behavior which might subject them to sanctions. As outlined by the Court above, the Enis Defendants embarked on a course of conduct designed to mislead the plaintiffs and the Court as to the actual role they played in the production of adidas and Nike products. Moreover, even if the Court had not ultimately agreed with plaintiffs' position, plaintiffs had a substantial basis for concluding that a motion was warranted. Finally, plaintiffs did not file the motion until they had secured the permission of the Court. Given this permission, the Court fails to see how Shapiro can maintain that there was no basis for the filing of the motion.

### E. Applicability of 28 U.S.C. § 1927

■ Section 1927 provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. This provision "imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics," *Bowler v. U.S. Immigration and Naturalization Service,* 901 F.Supp. 597, 604 (S.D.N.Y.1995) (citation omitted), and applies only to attorneys.

The purpose of § 1927 is to deter unnecessary delays in litigation by penalizing attorneys personally. Unlike Rule 11 sanctions,

which focuses on particular papers, § 1927 sanctions may involve any conduct which generates needless proceedings. The Court finds that Shapiro's conduct during the course of this litigation subjects it to sanctions under § 1927. Shapiro's questionable conduct began with its earliest involvement in the case as it began attacking the plaintiffs for naming the Enis defendants in the lawsuit. While it may not have been apparent exactly what role the Enis Defendants played in the events at issue in this case, the evidence very early on supported their presence in the lawsuit. As the evidence piled up and the witnesses continued to implicate Enis and his companies, Shapiro maintained its steady campaign of attack, which only served to divert the plaintiffs and the Court from the real issues in the case.

Shapiro's defense is that they believed their client and that they shouldn't be faulted for vigorously advocating their client's position. While the line between zealous advocacy and vexatiousness may not always be obvious, Shapiro spent most of its time on the wrong side of the line. When witnesses testified concerning actions by Enis, Shapiro accused plaintiffs' counsel of improperly influencing those witnesses. When Enis identified Bill Wilson as the person responsible for the day-to-day operation at MHK, plaintiffs spent considerable time trying to schedule that deposition, only to discover that Enis did not know where to find Wilson. The Court finds that it was incumbent upon Shapiro to inform plaintiffs counsel that Wilson was not available, rather than to complain about when and where the deposition would take place. Frankly, the Court does not understand how counsel for defendants could agree to a date without knowing the availability of the witness.

When counsel's conduct unnecessarily delays the discovery proceedings, § 1927 sanctions are appropriate. *See Morales v. Zondo, Inc.*, 204 F.R.D. 50 (S.D.N.Y.2001) (counsel ordered to pay opposing counsel's hourly rate where counsel's overzealous representation caused unnecessary, vexatious delay); *Unique Concepts, Inc. v. Brown*, 115 F.R.D. 292 (S.D.N.Y.1987) (counsel's contentious, abusive, obstructive, scurrilous, and insulting conduct during deposition warranted sanctions under § 1927); *Tedeschi v. Smith Barney, Harris Upham & Co., Inc.*, 579 F.Supp. 657 (S.D.N.Y.1984) (attorney's conduct including making frivolous motion and seeking reargument of decided motions warranted sanctions under both Rule 11 and § 1927); *Brignoli v. Balch Hardy & Scheinman, Inc.*, 126 F.R.D. 462 (S.D.N.Y.1989), *modified on reargument*, 735 F.Supp. 100; *In re Interstate Steel Setters, Inc.*, 65 B.R. 312 (Bankr.N.D.Ill.1986) (attorney's conduct was "vexatious" within the meaning of § 1927 where attorney misrepresented to court that he did not really know if documents presented by defendants were authenticated, even though attorney knew all along that documents were actually copies).

## IV.  CONCLUSION

Jay Enis and his counsel, Shapiro & Shapiro have engaged in practices which have violated the Federal Rules of Civil Procedure and 28 U.S.C. § 1927. For those violations the Court imposes the following sanctions:

(1) the Enis Defendants will pay the plaintiffs the reasonable attorney's fees and costs associated with the depositions of

> Andrew Cancel
>
> Neil Drori
>
> David Feffer
>
> David Jurrist
>
> Paul Owenby
>
> Thomas Parker
>
> Jay Enis (January 2002);

(2) the Enis Defendants will pay the plaintiffs the reasonable attorney's fees and costs associated with the instant motion for sanctions;

(3) the firm of Shapiro & Shapiro will pay the plaintiffs the reasonable attorney's fees and costs associated with the reply memorandum on the sanction motion;

(4) the Enis Defendants are precluded from introducing evidence on the issue of damages;

(5) the plaintiffs will be given all reasonable inferences against the Enis Defendants on the issue of damages.

Counsel for plaintiffs are directed to submit supporting documentation for the fees and expenses so awarded by July 25, 2003.